## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| **TREVOR HILL, STACI HILL, QAMARUN M. SHAIKH and MUJAHIDDIN SHAIKH, individually and on behalf of all others similarly situated,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**NATIONSTAR MORTGAGE LLC and SOLUTIONSTAR,**<br><br>**Defendants.** | **No. _____**<br><br><br>**CLASS ACTION COMPLAINT** |

Plaintiffs Trevor Hill, Staci Hill, Qamarun M. Shaikh and Mujahiddin Shaikh ("Plaintiffs"), individually and on behalf of all others similarly situated, allege as follows:

### INTRODUCTION

1.      Plaintiffs bring this class action individually and on behalf of all persons who have or had residential mortgage loans serviced by Defendant Nationstar Mortgage LLC ("Nationstar")[1] and, in connection therewith, were charged for a property inspection after becoming delinquent in their mortgage payments.

2.      This class action seeks to put an end to Nationstar's illegal practice of automatically ordering property inspections via its computerized loan servicing system, the price of which are inflated by a kickback that Plaintiffs allege on information and belief is retained by Nationstar's affiliate, Solutionstar, and assessing the charges on borrowers without regard to the

---

[1] Nationstar, together with Defendant Solutionstar ("Solutionstar") are referred to herein as "Defendants."

terms of borrowers' loans, the applicable laws and regulations, and the requirements of the owners/note holders/investors/guarantors (collectively, "Lenders") of the borrowers' loans.

3.     Specifically, as set forth in detail below, Defendants engaged in a fraudulent scheme during the relevant time period in violation of federal and state laws to extract improper, unwarranted and unreasonable property inspection and other fees from Plaintiffs and the Classes when they became delinquent in their mortgage payments.  Nationstar utilized a computerized mortgage servicing system that automatically assessed these fees on Plaintiffs and the Classes and ordered so-called "drive by" property inspections via an affiliated entity, Solutionstar, without regard to the relevant circumstances.  Solutionstar, in turn, utilized a web of outside vendors who acted in concert with Nationstar and Solutionstar to effectuate the scheme to exact improper inspection fees and late charges from homeowners who had become delinquent in their mortgage payments.

4.     Instead of being based on reasonable parameters – such as whether borrowers' mortgage contracts or applicable law permitted and/or the Lender's guidelines required the inspections, Nationstar's computer servicing system was programmed to order the inspections and impose as many charges and fees as possible – frequently ordering *multiple inspections in a single month*.  Nationstar routinely engaged in this abusive conduct even after it had been notified by the borrowers' attorney that the property was inhabited and in good condition.

5.     Defendants' practices have not gone unnoticed.  On March 5, 2014, the New York Department of Financial Services ("NYDFS") sent Nationstar's CEO, Jesse Bray, a letter citing

numerous complaints that the NYDFS received concerning Nationstar's loan servicing activities, including "improper fees."[2] *See* NYDFS Letter, Mar. 5, 2014 (attached as Exhibit 1).

6.     Defendants' scheme has been ongoing at least since Nationstar began to order property inspections through Solutionstar in 2012.   Around that time, Nationstar began to increase the fees that it charged borrowers in connection with property inspections – from $9.15 to $15 per drive-by inspection (a 64% increase in price).   On information and belief, Solutionstar retains a portion of the each inspection fee which accounts, at least in part, for the increase in the charges.   Because Nationstar's parent companies profit from property inspections through their ownership of Solutionstar, Nationstar is incentivized to order property inspections even where they are excessive in frequency and price, unnecessary, inappropriate, or otherwise unlawful.

7.     Defendants have profited enormously from this fraudulent scheme.   Nationstar's assessment of property inspection fees on borrowers creates profits for Solutionstar and facilitates Nationstar's assessment of *additional* default-related fees such as late fees.   The increased indebtedness caused by Defendants' unnecessary property inspection policies further enables Nationstar to push delinquent borrowers into pricey modifications and refinances that result in increased fee and/or origination income for Nationstar as well.

8.     Plaintiffs bring this action to put an end to Defendants' scheme and to recover the improper, unwarranted and unreasonable fees charged to Plaintiffs and all Class members.

---

[2] In that letter, the NYDFS also requested "[a] list of third-party vendors, including but not limited to affiliates and companies that provide servicing … related services to Nationstar, including but not limited to Solutionstar, … and a description of the services provided by each company.   For affiliated companies that provide such services to Nationstar, describe the relationship between such companies and Nationstar, and provide policies, practices, and procedures employed by Nationstar and the affiliated companies to avoid or mitigate potential conflicts of interest."

9.     As alleged below, Defendants' misconduct violates the federal Racketeer Influenced Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1962(c) (Count I); the RICO conspiracy provision, 18 U.S.C. § 1962(c) (Count II); the Florida Racketeer Influenced Corrupt Organizations Act ("Florida RICO"), Florida Statutes Sec. 895.03(3) (Count III); the Florida RICO conspiracy provision, Florida Statutes Sec. 895.03(4) (Count IV); the Florida Civil Remedies for Criminal Practices Act (the "FCRCP Act"), Florida Statutes Sec. 772.103(3) (Count V); breaches Plaintiffs and members of the Florida Common Law Class's mortgage contracts against Nationstar (Count VI); and unjustly enriches Solutionstar (Count VII).

## PARTIES

10.     Plaintiffs Trevor and Staci Hill are married citizens of the State of Florida.  On May 15, 2007, the Hill Plaintiffs executed a Promissory Note in favor of The Addison Mortgage Group, Inc. The Note was secured by a mortgage on the Hill Plaintiffs' primary residence in Ft. Lauderdale, Florida. A copy of the mortgage is attached hereto as Exhibit 2. The Hill Plaintiffs' mortgage is currently serviced by Nationstar and owned and/or guaranteed by Federal National Mortgage Association ("Fannie Mae").  On or about October 1, 2011, the Hill Plaintiffs became delinquent in their mortgage payments.  The Hill Plaintiffs have, however, continuously lived in their home despite the delinquent status of their payments.  The Hill Plaintiffs have been in consistent contact with Nationstar either on their own or through their undersigned counsel. Through that contact, the Hill Plaintiffs have informed Nationstar that they continue to live in the property.  The Hill Plaintiffs have been and continue to attempt to resolve the delinquency.  For example, after applying to modify their loan in or around May 2013, the Hill Plaintiffs were offered a modification in October 2014, which they accepted and began making their trial payments.

11.     Plaintiffs Qamarun M Shaikh and Mujahiddin Shaikh are married citizens of the State of Florida.  On November 2, 2005, the Shaikh Plaintiffs executed a Promissory Note in favor of First Magnus Financial Corporation. The Note was secured by a standard Fannie Mae/Freddie Mac Uniform Security Instrument mortgage on the Shaikh Plaintiffs primary residence located in Miami, Florida.  A copy of the mortgage is attached hereto as Exhibit 3. The Shaikh Plaintiffs' mortgage is currently serviced by Nationstar and owned and/or guaranteed by Fannie Mae.  On or about August 1, 2009, the Shaikh Plaintiffs became delinquent in their mortgage payments.  The Shaikh Plaintiffs have, however, continuously lived in their home despite the delinquent status of their payments.  The Shaikh Plaintiffs have been in consistent contact with Nationstar either on their own or through their undersigned counsel.  Through that contact, the Shaikh Plaintiffs have informed Nationstar that they continue to live in the property. The Shaikh Plaintiffs have been and continue to attempt to resolve the delinquency.  For example, in February 2014, the Shaikh Plaintiffs submitted an application to modify their mortgage terms.

12.     Defendant Nationstar is a Delaware limited liability company with its principal place of business in Lewisville, Texas.  Nationstar is the principal servicing subsidiary of Nationstar Mortgage Holdings, Inc.,[3] a publicly traded holding company that is "engaged primarily in the servicing of residential mortgage loans for others, the origination of, selling or securitization of single-family conforming mortgage loans to GSEs or other third-party investors in the secondary market…."  *See* Nationstar Mortgage Holdings, Inc., Form 10-K For the Fiscal Year Ended December 31, 2013 Annual Report ("*2013 10-K*"), p.8, available at http://investors.nationstarholdings.com/Cache/23214130.PDF?Y=&O=PDF&D=&FID=2321413

---

[3] Nationstar Mortgage Holdings, Inc. is approximately 75% owned by FIF HE Holdings, Inc., an indirect subsidiary of the private equity firm, Fortress Investment Group.

0&T=&OSID=9&IID (last visited Jan. 20, 2015).  Nationstar is the fifth largest residential mortgage servicer in the country and the second largest non-bank mortgage servicer.  *See* Nationstar Mortgage Holdings, Inc., Form 10-Q for the Period Ended Sept. 30, 2014 ("*3d Quarter 10-Q*"), p.51, available at http://www.sec.gov/Archives/edgar/data/1520566/000152056614000080/nsmhinc0930201410-q.htm (last visited Jan. 20, 2015).

13.     Defendant Solutionstar ("Solutionstar") is a Delaware limited liability company with its principal place of business in Lewisville Texas.  Solutionstar is a wholly owned subsidiary of Nationstar Mortgage Holdings, Inc. and an affiliate of Defendant Nationstar. "Solutionstar provides technology and data enhanced solutions to home buyers, home sellers, real estate agents, and companies engaged in the origination and/or servicing of mortgage loans." *3d Quarter 10-Q* at 52.  Among the services offered by Solutionstar are "a national network of certified appraisers delivering a competitive suite of full and limited valuation products."  *See* http://www.solutionstar.com/pages/valuationservices (last visited Jan. 20, 2015).  Among the limited valuation products offered are "[d]rive-bys," "[e]valuations," and "[r]e-inspection/[r]e-certifications."  *Id.*  Solutionstar has provided various valuation and inspection services to Nationstar since at least April 2012.

## JURISDICTION AND VENUE

14.     This Court has federal question jurisdiction over Plaintiff's RICO claims pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964.  This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

15.     This Court also has original diversity jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d).  Plaintiffs are citizens of Florida.  Defendants are citizens of

different states – namely Delaware and Texas.  The amount in controversy in this action exceeds $5,000,000.00, and there are more than 100 members in each of the Classes.

16.     Venue is proper in this District under 28 U.S.C. § 1391(b) because Plaintiffs' properties securing their mortgages at issue in this litigation are located in this District. Moreover, according to Nationstar's 2013 Annual Report, "[a]s of December 31, 2013, approximately … 8.8% of the aggregate outstanding loan balance in [Nationstar's] forward servicing portfolio was secured by properties located in … Florida…. [Florida has] experienced severe declines in property values and [is] experiencing a disproportionately high rate of delinquencies and foreclosures relative to other states."  *Id.* at 30.  Thus, the geographic composition of Nationstar's servicing portfolio and the real estate market conditions in this State demonstrate that a substantial part of the acts and events giving rise to the claims in this class action occurred in this District.

## FACTUAL ALLEGATIONS

17.     Defendants are involved in servicing the fifth largest mortgage servicing portfolio in the United States.  This class action challenges Nationstar's common policy of utilizing its automated and computerized electronic servicing platform to order property inspections that were excessive in frequency and price, and that were unnecessary and otherwise unlawful, through its affiliate, Solutionstar, to generate illicit profits for each entity.

18.     Nationstar funnels business to its affiliate Solutionstar to generate revenue for Solutionstar.  Solutionstar, in turn, automatically generates requests for third-party vendors to complete so-called "drive-by" property inspections.  Solutionstar, for its part, receives payment in the form of a percentage of the property inspection fee.  When borrowers fail to timely pay for the charges imposed in connection with these drive-by inspections, Nationstar imposes additional

late fees on the borrower driving the borrower into a debt spiral.  Nationstar further exacerbates the effects of this scheme by programming its computerized servicing system to request property inspections *multiple times per month* and irrespective of the actual condition of the property or circumstances of the loan – in contravention of the requirements of Lenders.

19.     Defendants' scheme takes advantage of the current structure of the mortgage industry and Nationstar's role as merely the Loan Servicer, and not the "Lender."  While the mortgage documents and Lender guidelines permit and in some circumstances require the Loan Servicer to conduct certain property inspections, Nationstar's scheme ignores these guidelines and imposes, without limitation: (a) more property inspections than are reasonable or appropriate as permitted by mortgage documents; (b) more property inspections than are required or requested by the Lenders; (c) more property inspections than are permitted by federal regulations and state laws; and (d) charges for property inspections that are inflated by kickbacks that Solutionstar retains for its role in the scheme.  Nationstar engages in this scheme with minimal risk because Lenders are required to reimburse Nationstar for the property inspection charges in the event that the borrower does not pay them.

**Background**

***The Current Mortgage Industry***

20.     Traditionally, when people sought to borrow money to purchase a home, they went to a financial institution that would loan them the money.  The financial institution would provide the loan money in return for an agreement that the borrower would repay the financial institution with interest.  The financial institution would carry the loan on its balance sheet, process the borrower's repayment, and send out notices and payment statements until the loan was repaid.

21.     More recently, this structure has changed.  Financial institutions no longer carry most of their mortgage loans on their books.  Instead, mortgages are packaged, bundled, and sold to investors through what is referred to as "Mortgage-Backed Securities" or "MBS" in a process called "securitization."   Through securitization, the lending financial institution immediately recoups the money loaned and insulates the financial institution from risk of a borrower default.

22.     As Sarah Bloom Raskin, Member of the Board of Governors of the Federal Reserve System has written:

> Before securitization became commonplace, it was much more likely for a mortgage to be serviced by the same entity that had originated the loan.  This simple approach ensured that lenders knew immediately if a homeowner was having payment problems, and could take action to mitigate possible losses.  A fair bit of this kind of "portfolio servicing" still takes place, but as the real estate market shifted from an originate-to-hold model to an originate-to-distribute model, an industry of independent third-party entities emerged to service the loans on behalf of the securitization trusts….   These servicing arrangements are now commonplace in the industry….

See Sarah Bloom Raskin, Member Board of Governors of the Federal Reserve System, *Remarks at the National Consumer Law Center's Consumer Rights Litigation Conference*, Boston, Massachusetts, Nov. 12, 2010, at 4 *available at* http://www.federalreserve.gov/news events/speech/raskin20101112a.htm (last visited Jan. 20, 2015) (hereafter "*NCLC Comments*").

23.     As part of the securitization transaction, the function of collecting monthly payments, as well as monitoring insurance coverage, paying taxes and performing other default and foreclosure-related tasks (collectively the "Servicing Rights") are divorced from the other rights and obligations of the Lender.   These Servicing Rights are either retained by the originating financial institution or its affiliate or subsidiary or they are packaged and sold to a third-party servicer (the entity acquiring these Servicing Rights becomes the "Loan Servicer"). Like the originating financial institution, the Loan Servicer bears no risk of loss in the event of a borrower's default.

24.    Nationstar has described its position as Loan Servicer in this diagram:



Available    at    http://www.sec.gov/Archives/edgar/data/1507951/000119312512161857/d317
546d424b3.htm (last visited Jan. 20, 2015).

25.    The Lenders (*i.e.*, the Mortgage Owners in the above diagram), on the other hand,
stand to lose substantially when a loan is foreclosed because the foreclosure sale price is
frequently insufficient to cover the loan principal plus the cost of foreclosure.[4]  *See, e.g.*, *infra*,
¶¶ 35-36 & 42-43.

*Structure of a Mortgage Transaction*

26.    Residential mortgage loans typically have two parts, the note and the security
instrument (also known as the "Deed of Trust" or the "Mortgage").  The note provides for the
provision of funds and repayment.  The security instrument governs the use of the home as
collateral for the loan.  The provisions related to protecting the property are contained in the
Deed of Trust/Mortgage because they pertain to the use of the property as security for the loan.

---

[4] Additionally, when loans are securitized and are foreclosed on, investors lose the future income
they would receive from a performing loan because the foreclosed loan is not replaced in the
security.

27.     Most mortgage loans in the United States use either the Standard Fannie Mae/Freddie Mac Security Instrument (the "Fannie Mortgage") or the Standard FHA Deed of Trust (the "FHA Mortgage").[5]

28.     The parties to a mortgage contract at origination are the borrower and the originating Lender.   Subsequent to closing, the originating Lender assigns the rights and obligations to multiple entities.   The Servicing Rights are either retained by the originating Lender or its affiliate/subsidiary or are sold to a third-party Loan Servicer.   Due to this assignment, the Loan Servicer acquires (or retains depending on the Loan Servicer's identity) the contract rights and obligations of the Lender related to the servicing of the loan.   The originating Lender conveys its other rights and obligations to the investor/owner of the loan and/or the guarantor, where applicable.

29.     The Fannie Mortgage is instructive on the sharp distinction between the "Lender" and the "Loan Servicer."   The term "Lender," as used in the Fannie Mortgage, is a defined term. The "Lender" is the originating Lender who provides the funds to the Borrower in return for repayment plus interest, *i.e.*, the owner of the note.   *See* Fannie Mortgage, at "Definitions" ¶ (D).

30.     The Fannie Mortgage specifically contemplates that the owner of the note, the "Lender," may change, and recognizes the distinction between the "Loan Servicer" and the note owner:

> The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower.   A sale might

---

[5] Although each state has its own form Fannie Mortgage and FHA Mortgage, the language does not materially differ as between states or at any time during the relevant time period. Specifically, the Fannie Mortgage states "THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property."   Fannie Mortgage, at 3.   The FHA Mortgage contains similar uniform and non-uniform covenant sections.   The contractual provisions at issue in this case are within the uniform covenants sections.

> result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law.  There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note.

Fannie Mortgage, ¶ 20.

31.    Thus, under the Fannie Mortgage, when the Lender's interest in the Note is transferred – *i.e.*, when the right to receive principal and interest payments due under the note is sold to another entity – the "Lender" becomes the purchaser of the Note and Security Instrument.

32.    Importantly, the Fannie Mortgage draws an additional sharp distinction between the "Lender" and the "Loan Servicer."  Specifically, the "Lender" funds the loan and is entitled to repayment of principal and interest.  The "Loan Servicer" "collects Periodic Payments due under the Note and … Security Instrument and performs other mortgage loan servicing obligations …" Fannie Mortgage, ¶ 20.[6]

33.    The term "other mortgage loan servicing obligations" is undefined in the Fannie Mortgage, however, the Loan Servicer's duties and obligations are clearly filled in and defined by the Fannie Mae or Freddie Mac written Seller/Servicer Guidelines (the "Guidelines") when the loan is sold to those entities.

### Effect of a Borrower's Default on the Loan Servicer

34.    In the event of a default by the Borrower, the GSE/Mortgage-owner (*i.e.*, the Lender) suffers the principal loss.  *See 2013 10-K*, p.10 ("Loan servicers service on behalf of the owners of the loans, and servicers are therefore exposed to minimal credit risk.").

---

[6] The term "Periodic Payments" is defined as "the regularly scheduled amounts due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 [referring to taxes and insurance premiums in escrow]…." Fannie Mortgage, "Definitions" ¶ (O).

35.     If the Loan Servicer advanced payments on taxes, insurance premiums or other default/foreclosure related costs (including, without limitation, property inspections), the Loan Servicer does not suffer a loss of those advances in the event of foreclosure.  Rather, the Lender reimburses the Loan Servicer for the outstanding amount.  *See, e.g.*, *2013 10-K*, p.3 ("[Servicing] advances can include … fees to preserve and protect the property and legal fees to foreclose on the property.  Serving advances are reimbursed to the servicer if and when the borrower makes a payment on the underlying mortgage loan at the time the loan is modified or upon liquidation of the underlying mortgage loan.").

36.     The Loan Servicer's risk of loss in the event of a Borrower's default and foreclosure is limited to a loss of the right to receive future servicing fees on the loan.  In the event of default and foreclosure, Loan Servicers also stand to collect additional fee income including late fees, attorney fees, foreclosure fees, *etc.*, that exceed the value of the servicing fees paid to Loan Servicers by Lenders.  If the Loan Servicer manages to work with the borrower to modify or refinance the delinquent loan, the Loan Servicer typically receives a fee in connection with that outcome as well.  *See 2013 10-K*, p.10 ("We also generate incentive fees from owners of the loans that we service for meeting certain delinquency and loss goals and for arranging successful loss mitigation programs.  Moreover, we earn incentive fees from the U.S. Treasury for loans that we successfully modify within the parameters of HAMP and other assistance programs it sponsors.").

37.     The potential loss of base servicing fees can pale in comparison to the ancillary fee compensation received by the Loan Servicer in connection with default servicing activities.  Indeed, where the compensation received in connection with default servicing activities is greater than the present value of servicing fees – as is often the case, the Loan Servicer has a

greater interest in forcing borrowers into (and ensuring they stay in) default than in a fully performed loan.

38.     Moreover, the average duration of mortgage loans in the United States is seven years.  In fact, in valuing its mortgage servicing rights ("MSRs"), Nationstar estimates that the loans in its servicing portfolio will only endure, on average, for 4.63 or 7.88 years depending on whether the borrower is "Credit Sensitive"[7] or "Interest Rate Sensitive."[8]  Thus, on average, the Loan Servicer anticipates receiving far less than thirty (30) years of loan servicing fees making the expected value of the Servicing Rights at closing (or at any other time during the life of a loan) to a Loan Servicer, significantly less than the present value of 30 years of servicing fees.[9]

*How Loan Servicers Earn Income*

39.     "Loan servicing primarily involves the calculation, collection and remittance of principal and interest payments, the administration of mortgage escrow accounts, the collection of insurance claims, the administration of foreclosure procedures, the management of real estate owned (REO), and the disbursement of required protective advances."  *2013 10-K*, p.10.

40.     Nationstar earns revenue from mortgage loan servicing in three principal ways. First, Nationstar receives a fixed fee for each loan which is determined by the servicing

---

[7]  Nationstar defines "Credit-Sensitive Loan[s]" as "[M]ortgage loan[s] with certain characteristics such as low borrower credit quality, relaxed original underwriting standards and high LTV, which we believe indicates that the mortgage loan presents an elevated credit risk." *2013 10-K*, p.1.

[8]  Although Nationstar does not define "Interest Rate Sensitive" loans, Nationstar does note that "[t]o the extent [Nationstar is] able to refinance credit sensitive MSRs to conforming loans, our MSR portfolio shifts from credit to interest rate sensitive."  In this context, Nationstar defines "Interest Rate Sensitive" loans as those which are not "credit-sensitive."

[9]  To the extent that the Loan Servicer can induce a borrower to refinance or modify their loan with the Loan Servicer, the Loan Servicer may reap additional fee income from the Lender (if the loan was in default), the U.S. Treasury (if the loan is modified through the HAMP program), the borrower (by adding the aggregated fees charged to the borrower into the principal), and/or may receive origination income in connection with the new loan.  Such a transaction is lucrative for the Loan Servicer.

agreements between Nationstar and the investors or note holders.  *See 2013 10-K*, p.97 ("Nationstar receives a base servicing fee ranging from 0.25% to 0.50% annually on the remaining outstanding principal balances of the loans.  The servicing fees are collected from investors.").  Second, Nationstar earns "float" income from accrued interest between when consumers pay and when those funds are remitted to Lenders, investors, taxing authorities, insurers and other relevant parties. *See 2013 10-K*, p.10 ("[Nationstar] earn[s] interest income on amounts deposited in collection accounts and amounts held in escrow to pay property taxes and insurance, which we refer to as float income.").  Third, Nationstar receives ancillary fee income that includes, without limitation, late charges paid by borrowers, workout and modification incentive fees, and other delinquency-related fee income.

41.    Two important sources of ancillary fee income for Defendants are property inspection fees and late fees.  As described more fully herein, each time Nationstar inspects the property and assesses a property inspection fee on a borrower, the borrower must pay an additional $15 (the amount Nationstar presently charges) to become current.  If the borrower fails to become current, Nationstar imposes late fees on the borrower.  Thus, the practice makes it more difficult for distressed borrowers to become current and leads many borrowers into foreclosure proceedings and/or to modify their loan.  As explained above, this is economically desirable for Nationstar.  Because Loan Servicers like Nationstar generate revenue from loan servicing activities and fees, and do not profit directly from interest payments made by borrowers, Loan Servicers have a vested interest in generating revenue through so-called default servicing activities and corresponding ancillary fees (should they choose to take advantage of their role in the current mortgage servicing industry in this regard).  Some of these fees, such as late fees, are pure profit for the Loan Servicer.  Other fees permit the Loan Servicer to generate

additional income by delegating the task to an affiliated entity or entity that returns a profit to the Loan Servicer.[10]

42.     Furthermore, because Nationstar is able to generate more loan servicing income through default servicing activities as compared to ensuring that borrowers make timely payments on the mortgage to the benefit of the owner/investor of the loan, Nationstar is incentivized to keep borrowers in default which is contrary to the interest of both borrowers and the Lenders.  Indeed, according to one member of the Board of Governors of the Federal Reserve System, "a foreclosure almost always costs the investor [of the loan] money, but [it] may actually earn money for the servicer in the form of fees."  Raskin, *NCLC Comments*.

43.     Therefore, it is important to note that Loan Servicers, including Nationstar, and Lenders have a conflict of interest.  Even though the loan servicing and default servicing tasks performed by Nationstar are purportedly to protect the Lender, such tasks and associated charges must be critically evaluated.  The appropriate metric for evaluating such tasks and charges are the Lender guidelines, rules and/or regulations that set forth the Loan Servicer's obligations with respect to the specific tasks at issue.  None of these documents suggest that it is appropriate to inspect a property more than once during a 30-day period, if at all.  Rather, it is Nationstar's unilateral and self-serving determination that conducting these excessive property inspections is "appropriate."

---

[10] For example, in recent years, the practices of major Loan Servicers (including Nationstar) in the conduct of their lender-placed insurance ("LPI") programs have been the subject of substantial government investigation, regulation, and class action litigation (resulting in numerous substantial class action settlements).  These cases alleged that Loan Servicers received a kickback from their LPI vendors through affiliated entities.  Nationstar has a settlement pending in connection with their LPI program with an estimated recovery value of approximately $83 million.  *Branyen v. Nationstar Mortgage LLC*, No. 1:14-cv-20726 (S.D. Fla.).

### *Nationstar's History of Acting Adversely to Lenders*

44.     In recent years, Nationstar has been sued by at least one Lender for acting in a manner adverse to the Lender's interest.

45.     In *KIRP LLC v. Nationstar Mortgage LLC*, No. 650794-2013, filed in the New York State Supreme Court in Manhattan, mortgage-bond investor KIRP LLC alleged that Nationstar abdicated its responsibilities to investors by liquidating loans it serviced on behalf of Lenders "through on-line auctions at fire sale prices without authorization and in blatant abdication of its servicing duties [to Lenders]."  Complaint, Dkt. No. 2, 650794-2013 (N.Y. Sup. Ct. Mar. 7, 2013).

46.     The on-line auctions allegedly benefited Nationstar by: (a) allowing Nationstar to more quickly recoup certain advances they made on the mortgage loans as part of their servicing duties; (b) decreasing the pool of defaulted mortgages in Nationstar's servicing portfolio at a low cost; and (c) routing business to Nationstar's affiliate, www.auction.com.[11]

47.     These advances included charges for property inspections and other property preservation tasks that were ordered for the loans.  Nationstar had previously purchased the right to collect these advances from the prior servicer.  The lawsuit alleged that Nationstar liquidated the loans, in part, to immediately recoup such advances.

48.     In February 2014, Nationstar and KIRP reached a settlement in that action.

_____

[11] Auction.com is owned by several private equity fund shareholders including funds managed by Fortress Investment Group.  *See* http://www.housingwire.com/articles/29190-auctioncom-lands-50-million-google-capital-investment (last visited Jan. 20, 2015).  Fortress Investment Group's funds also own Nationstar Mortgage Holdings, Inc., Defendants' indirect parent. Auction.com and Nationstar cross promote as well.   Notably, auction.com advertises for Nationstar on its website (http://www.auction.com/nationstar.php (last visited Jan. 20, 2015)). Since the KIRP lawsuit, Nationstar has launched its own, affiliated real estate auction site http://www.homesearch.com.   *See*   http://www.housingwire.com/blogs/1-rewired/post/29952-nationstar-moves-one-step-closer-to-total-mortgage-market-domination (last visited Jan. 20, 2015).

49.     The KIRP lawsuit demonstrates that it has previously been alleged that Nationstar has acted in concert with an affiliate to enrich themselves at the expense of a Lender and further demonstrates that a Loan Servicer's and Lender's interests are not necessarily aligned.

**Property Inspections for Borrowers in Default**

*Loan Servicers' Obligations*

50.     Loan Servicers are obligated to perform various tasks on behalf of the Lender that holds a loan.

51.     These tasks include, without limitation, collecting monthly payments, monitoring insurance coverages, and ensuring that taxes are paid.   Additionally, Loan Servicers are responsible for taking action to protect the properties securing loans when certain triggering circumstances arise, *e.g.*, obtaining lender-placed insurance when the Loan Servicer determines that the property is uninsured and/or securing a property that has been abandoned to avoid damage.

52.     The tasks Loan Servicers perform and the standards Loan Servicers adhere to in performing them are determined by owner/investor guidelines.   For example, Fannie Mae and Freddie Mac each issue written servicing guides that delineate the tasks that Loan Servicers must perform and standards applied in evaluating Loan Servicer performance.   Loan Servicers are further bound by the terms of the mortgage contracts and applicable laws and regulations.

*Lender Guidelines*

53.     The provisions of the Fannie Mae and Freddie Mac Guidelines referencing property inspections do not require or suggest that Loan Servicers order property inspections more frequently than once every 30 days.

54.     For example, in Section 303 of the Fannie Mae Servicing Guidelines Fannie states:

> Generally, the servicer does not have to inspect a property that secures a delinquent mortgage loan if it has established [Quality Right Party Contact[12] ("QRPC")] with the borrower and is working with the borrower to resolve the delinquency … or a full payment has been received within the last 30 days.
>
> The servicer must order the property inspection by the 45th day of delinquency and complete the property inspection no later than the 60th day of delinquency if QRPC has not been achieved or a full payment has not been received within the last 30 days.  The servicer must continue to obtain property inspections every 30 days until it establishes QRPC as long as the mortgage loan remains 45 days or more delinquent.

55.     This provision is designed to determine whether the property is occupied when the Loan Servicer has been unable to establish contact with borrowers and payments have not been received.  Indeed, the provision does not authorize or permit inspections when the Loan Servicer is in contact with the borrower and knows the property to be inhabited.

56.     As stated above, Plaintiffs' mortgage loans are owned and/or guaranteed by Fannie Mae.  The modification application submitted by all Plaintiffs was a QRPC under the Fannie Mae Servicing Guidelines.  Yet, Defendants continued ordering property inspection well after it knew that a QRPC was made.

57.     In certain situations, the Guidelines do make exceptions to the 30-day inspection rule.  Each of these situations require that the Loan Servicer first identify a circumstance at the property that warrants additional inspections.  For example, Section 303.01 of the Fannie Mae

---

[12] "Quality right party contact occurs when you establish a rapport with the borrower expressing a desire to help identify and discuss with the borrower, co-borrower, or trusted advisor, such as a housing counselor, the most appropriate options for delinquency resolution." http://www.freddiemac.com/learn/pdfs/service/qrpc.pdf.   "QRPC is a uniform standard for communicating with the borrower … about resolution of the mortgage delinquency."  Fannie Servicing Guidelines, Part D, Subpart 2, Chapter 2, at 399.

Guidelines, which addresses property inspections for borrowers who are delinquent on a previously negotiated repayment plan, states:

> A servicer must inspect a property as soon as it becomes aware of a borrower's delinquency under a repayment plan, and continue inspecting the property at 30-day intervals.  If an inspection reveals evidence of vandalism or major damage to the property (or vandalism in the vicinity of the property), the servicer should schedule the property inspections at more frequent intervals.  The inspections should continue to be made until such time as the mortgage is brought current or, if the servicer decides to initiate foreclosure proceedings or accept a deed-in-lieu, until the date that the servicer makes the required comprehensive property inspection prior to the foreclosure sale or the date the deed-in-lieu is executed.

58.     Similarly, Section 302 of the Fannie Mae Guidelines discusses property inspections where the Loan Servicer becomes aware of the possibility that the borrower may have abandoned the property or where the property is vacant or tenant-occupied.

59.     These provisions do not authorize or require inspections more frequently than once every 30 days even where the Loan Servicer is unable to establish a QRPC.

60.     That Nationstar's common automated and computerized policy in violation of the Guidelines, as discussed herein, has thus far escaped notice and/or action by Fannie Mae and Freddie Mac is unsurprising.  As explained by the Federal Housing Finance Agency ("FHFA"), the conservator of Fannie Mae and Freddie Mac which together own or guarantee approximately $4.8 trillion in mortgage loans:

> [Fannie Mae and Freddie Mac] use a delegated business model to buy and service mortgage loans.  In this model, they contract with third-party mortgage loan sellers and/or servicers (e.g., counterparties, such as banks) that are relied on to comply with their requirements for … servicing the … loans [purchased or guaranteed by Fannie Mae or Freddie Mac] (e.g., collecting payments); and [] reporting data about the loans.  As a result of relying on the counterparties for compliance and reporting, [Fannie Mae and Freddie Mac] run the risk of their counterparties failing to meet their respective … servicing guidelines.

Letter from Russell A. Rau, Deputy Inspector General for Audits of the FHFA, to Nina Nichols, Deputy Director for Enterprise Regulation, *Audit of FHFA's Oversight of Risks Associated with*

*the Enterprises Relying on Counterparties to Comply with Selling and Servicing Guidelines* (Sept. 26, 2014) ("Counterparty Risk Letter"), at 1, *available at* http://fhfaoig.gov/Content/Files/AUD-2014-018.pdf (last visited Jan. 20, 2015).

61.     In the Counterparty Risk Letter, the Office of Inspector General for the FHFA then wrote:

> In the mid-1990s, one of the Enterprises required an independent, third-party assurance of counterparties' compliance with some elements of its guidelines, but this requirement was replaced by ***reliance on counterparties' self-representations of their compliance.*** Further, the Enterprises have risk-based, internal oversight of their counterparties' compliance with selling and servicing guidelines but ***most receive no onsite review.***

Counterparty Risk Letter (emphasis added), at 1.

62.     The OIG of the FHFA has also previously found that Fannie Mae and Freddie Mac "do not ensure counterparties' business practices follow all federal and state laws and regulations designed to protect consumers from unlawful activities...." Counterparty Risk Letter, at 11. "In addition, OIG identified that [Fannie Mae and Freddie Mac] do not have a formal monitoring program in place to review their counterparties' compliance with the federal and state laws that govern … servicing mortgage loans. Instead, [Fannie Mae and Freddie Mac] rely primarily on counterparty self-certifications of contractual compliance along with federal regulators' supervisory and enforcement activities." *Id. See also* FHFA OIG, *FHFA Should Develop and Implement a Risk-Based Plan to Monitor Oversight of Their Counterparties Compliance with Contractual Requirements Including Consumer Protection Laws* (Mar. 26, 2013), *available at* http://www.fhfaoig.gov/Content/Files/AUD-2013-008_0.pdf; Letter from Steve A. Linick, Inspector General of FHFA to Edward J. DeMarco, Director, Systemic Implication Report: Enterprise Oversight of Property Preservation Inspections (Nov. 26, 2012), *available at* http://fhfaoig.gov/Content/Files/SIR%20FINAL%20Enterprise%20Oversight%20of%20Property%20Preservation_0.pdf (uncovering fraud by property inspection vendor and

questioning whether Fannie Mae and Freddie Mac had sufficient protections in place to detect fraud).

### *Contractual Provisions*

63.     Borrowers' mortgage loan contracts contain specific provisions concerning a Loan Servicer's ability to order Property Inspections and charge Borrowers for the cost of such inspections.

64.     In Paragraph 7 of the standard Fannie Mortgage, the Lender or its agent "may make reasonable entries upon and inspections of the Property."  The Fannie Mortgage further provides that if the "Borrower fails to perform the covenants and agreements contained in [the mortgage agreement] … or Borrower has abandoned the Property, then Lender may do and pay for whatever is *reasonable or appropriate* to protect Lender's interest in the Property and rights under [the mortgage agreement] including protecting and/or assessing the value of the Property…."  Fannie Mortgage, ¶ 9 (emphasis added).  The Fannie Mortgage provides that any amounts disbursed by the Lender for taking action under paragraph 9 becomes additional debt of the Borrower.

65.     Loan Servicers of loans owned or guaranteed by Fannie Mae or Freddie Mac must follow the standards and procedures of the Fannie Mae and Freddie Mac Servicing Guidelines. Thus, these Guidelines clarify what is "reasonable or appropriate" under Paragraphs 7 and 9 of the Fannie Mortgage.  *See* discussion, *supra*.

66.     Similarly, the standard FHA Mortgage provides, in Paragraph 5:

Lender may inspect the Property if the Property is vacant or abandoned or the loan is in default.  Lender may take *reasonable* action to protect and preserve such vacant or abandoned Property.  [Emphasis added.]

67.     In Paragraph 7 of the standard FHA Mortgage, the Lender is afforded the right to

Lender may do and pay whatever is *necessary* to protect the value of the Property and Lender's rights in the Property, including payment of taxes, hazard insurance and other items mentioned in paragraph 2.  [Emphasis added.][13]

Any amounts disbursed by Lender under this paragraph shall become an additional debt of Borrower and be secured by this Security Instrument.  These amounts shall bear interest from the date of disbursement, at the Note rate, and at the option of Lender, shall be immediately due and payable.

68.     However, as discussed *infra*, federal regulations make clear that the Lender – and Loan Servicers – are not permitted to assess charges for property inspections on borrowers unless the Lender – or Loan Servicer – has reason to believe the property is vacant.

### *Applicable Laws and Regulations*

69.     Certain federal regulations and state laws also govern whether Loan Servicers – including Nationstar – may order a property inspection in connection with loans and assess the charge for the inspections to borrowers.

70.     For example, for loans secured by properties in the State of Maryland, Maryland Code § 12-121 expressly prohibits Lenders and Loan Servicers for post-default, visual inspections of a residence's exterior that are made to ascertain the condition of the security.  *See, e.g.*, *Taylor v. Friedman*, 689 A.2d 59 (Md. 1997).

71.     Section 12-121 of the Maryland Code states, in pertinent part:

**Lender's inspection fees.**

(a) *Defined.* – In this section, the term 'lender's inspection fee' means a fee imposed by a lender to pay for a visual inspection of real property.

(b) *Imposition.* – Except as provided in subsection (c) of this section, a lender may not impose a lender's inspection fee in connection with a loan secured by residential real property.

(c) *When permitted.* – A lender's inspection fee may be charged if the inspection is needed to ascertain completion of:

---

[13] Paragraph 2 of the FHA Mortgage concerns "Monthly Payment of Taxes, Insurance and Other Charges."  Paragraph 2 does not discuss or reference property inspections.

     1.  Construction of a new home; or

     2.  Repairs, alterations, or other work required by the lender.

(d) *Applicability of section to appraisals.* – This section does not apply to an appraisal of the value of real property by a lender or to fees imposed in connection with an appraisal.

72.     Thus, Maryland law prohibits Loan Servicers from charging borrowers for the property inspections assessed on the Classes.

73.     A federal regulation, 24 C.F.R. § 203.377, also imposes a limitation on Loan Servicers' ability to legally order property inspections and impose the costs on borrowers. Specifically, Section 203.377 states, in pertinent part:

> The mortgagee, upon learning that a property subject to a mortgage insured under this part is vacant or abandoned, shall be responsible for the inspection of such property at least monthly, if the loan thereon is in default. When a mortgage is in default and a payment thereon is not received within 45 days of the due date, and efforts to reach the mortgagor by telephone within that period have been unsuccessful, the mortgagee shall be responsible for a visual inspection of the security property to determine whether the property is vacant. The mortgagee shall take reasonable action to protect and preserve such security property when it is determined or should have been determined to be vacant or abandoned until its conveyance to the Secretary, if such action does not constitute an illegal trespass. "Reasonable action" includes the commencement of foreclosure within the time required by § 203.355(b) of this part.

74.     A bankruptcy court in the Eastern District of Pennsylvania recently ruled that Section 203.377 of the federal regulations trumps any provision to the contrary in FHA Mortgages. *See In re Ruiz*, 501 B.R. 76 (Bkrtcy. E.D. Pa. 2013). In that case, the court ruled that notwithstanding the Loan Servicer's argument that the mortgage permitted inspections solely on the basis of default, the federal regulation controlled.

75.     Defendants' scheme as detailed herein ignores whether borrowers, including Plaintiffs and the Classes, inhabit their homes at the time of the inspections. Specifically, Nationstar deliberately programmed its loan servicing system such that it did not take the

occupancy of the home or any other relevant consideration into account when ordering property inspections. Plaintiffs, for example, expressly notified Nationstar that they inhabited their home. Despite that notice, Nationstar repeatedly ordered property inspections through its affiliate Solutionstar.

76.     The authorities cited herein, including, without limitation, the Fannie and Freddie Guidelines, the federal regulation cited above, *In re Ruiz* and the Maryland statute, create a substantial question as to whether Nationstar's actions in automatically ordering property inspections and assessing the costs to borrowers upon default are reasonable and appropriate. These authorities support at least three separate and independent reasons why Nationstar's conduct as alleged herein is neither reasonable nor appropriate: (a) it is neither reasonable nor appropriate to order multiple property inspections in a single 30-day period; (b) it is neither reasonable nor appropriate for Nationstar to impose charges on borrowers for visual property inspections; and (c) it is neither reasonable nor appropriate for Nationstar to engage in self-dealing and profit from these inspections at its borrowers' expense.

77.     Furthermore, these authorities support that it is improper for Nationstar to program its automated and computerized loan servicing system to automatically order property inspections and assess the "costs" of those inspections to borrowers without accounting for: (a) whether the inspections may be legally charged to borrowers; (b) whether Nationstar has reason to believe the property is abandoned; and (c) whether the frequency of the property inspections exceed the standards of reasonableness and appropriateness.

### *Nationstar's Property Inspections Process*

78.     Nationstar monitors its mortgage servicing portfolio using an automated computer system known as Loan Servicing and Accounting Management System ("LSAMS"). LSAMS is

a customizable loan servicing software platform sold by ISGN. *See* http://www.isgn.com/technology/servicing/ (last visited Jan. 20, 2015).  Nationstar began using LSAMS as its servicing system of record in May 2011 to document and monitor all servicing functions performed by Nationstar on all of the loans serviced by Nationstar.  Nationstar has coordinated LSAMS with other systems, databases and modules such as LenStar,[14] Remedy, RemedySTAR,[15] FORTRACS[16] and others (collectively, the "Servicing System").[17] Nationstar's Servicing System is programmed with the Lenders' minimum guidelines and required tasks in mind, but Nationstar has further customized its Servicing System to apply additional requirements for its own purposes and profit.  The ordering of multiple property inspections within a single 30-day period is one example of exceeding the Lender guidelines for Defendants' benefit.

79.    If a borrower is late making a payment, Nationstar's Servicing System will automatically order a property inspection and charge the borrower's account for the inspection after the loan has been in default for a certain number of days regardless of whether there is a lawful and reasonable basis for ordering the inspection or whether the borrower may be legally charged for the inspection.

80.    The Servicing System is fully automated.  It generates work orders for property inspections without human intervention.  Indeed, no employee of Nationstar is tasked with

---

[14]  LenStar is a default management communications software that provides bi-directional integration with attorney case management systems for mortgage banking organizations and attorneys involved in the servicing of loans in foreclosure, bankruptcy and eviction.

[15] Remedy and RemedySTAR are Nationstar's loan modification systems of record.

[16] FORTRACS is a software system that navigates the mortgage servicer user through default processes such as loss mitigation, foreclosure processing and bankruptcy processing.

[17] These secondary systems and databases perform and track automated functions of Nationstar's servicing system.

determining whether each property inspection is reasonably necessary to protect the Lender's interest in the property.

81.     The property inspection work orders are automatically sent, via Solutionstar, to either a third-party vendor or affiliate of Nationstar to fulfill.

82.     Once the vendor/affiliate receives the computer-generated property inspection work order, the inspection is performed and the cost is automatically charged to the borrower's account.  The property inspection report is uploaded to the Servicing System.

83.     After the first inspection is ordered, the Servicing System continuously orders additional inspections without regard to the existence of any condition warranting additional inspections until the borrower becomes current.  Even if a borrower misses only one monthly payment, but continues to make additional monthly payments, the borrower is in default and property inspections are repeatedly ordered.

84.     For example, Plaintiffs notified Nationstar that they were represented by counsel, continued to live in the home, and that no conditions were present that would require monitoring and inspection.

85.     Nevertheless, Nationstar continued to conduct inspections more often than once every 30 days.

86.     Numerous accounts of Nationstar's ordering property inspections when Lender guidelines do not call for such inspections are available on the internet.  The following are just a few examples:

> a.  "From the moment I was transferred from Bank of America [to Nationstar]-the harassment started…. They will charge an inspection fee but leave no note and/or what was seen on inspection.  They do this [if] you are 45 days late even if making continuous payments- they want to check to see if you are residing there however, they do not even get out of the car and leave a note.  They will continuously show you late even if you are on time.  You will never catch up

27

from      their      fees      and      bogus      balances."
http://www.ripoffreport.com/r/NATIONSTAR-
MORTGAGE/nationwide/NATIONSTAR-MORTGAGE-ERRONOUS-FEES-
INSPECTION-FEE-IF-45-DAYS-LATE-CALL-HARASSMENT-LEWISV-
1177851 (last visited Jan. 20, 2015).

b.  "Hello I am an employee at Nationstar and would like to blow a whistle saying
that. Customers are having addition Corporate Advances that they didn't know
about before they transferred to Nationstar. We use Excel to inspect Corporate
Advance invoices. Well I found that a lot of invoices have a credit where the
borrower doesn't owe anything for lawn cut or inspections. Yet employees or
managers are putting that they are correct on Excel prompting Nationstar to
charge customers for Corporate Advances they should not be paying for."
http://www.ripoffreport.com/r/Nationstar-Mortgage-LLC/Lewisville-Texas-
75067/Nationstar-Mortgage-LLC-Not-verifying-invoices-charging-double-
Corporate-Advances-Lewisvi-1104289 (last visited Jan. 20, 2015).

c.  "In Dec '12, my loan was transferred to Nationstar.  That's when the nightmare
began. … Also, I have received two $12 inspection fees so far since April.  They
say they are allowed to charge these fees per terms of the loan. … No one can
actually tell me what these fees are for, or how they are inspecting the property."
Complaint       dated       April       14,       2013,
http://www.consumeraffairs.com/finance/nationstar_mortgage.html?page=48 (last
visited Jan. 20, 2015).

d.  "[Nationstar] sent a third party to my property to inspect while I was not home
and said it was abandoned/empty even though totally furnished and lights and
heat      on."      Complaint      dated      November      8,      2013
http://www.consumeraffairs.com/finance/nationstar_mortgage.html?page=32 (last
visited Jan. 20, 2015).

87.    These complaints evidence Defendants' pattern and practice of utilizing their

Servicing System to assess charges for unreasonable, excessive and unlawful property

inspections on borrowers.

**RICO ALLEGATIONS**



88.     Defendants are all "persons" within the meaning of 18 U.S.C. § 1961(3).

89.     Based on Plaintiffs' current knowledge, the following persons constitute a group of individuals associated in fact that will be referred to herein as the "Enterprise":   (1) Nationstar; (2) Solutionstar; and (3) vendors who perform the property inspections discussed in this Complaint.

90.     The Enterprise is an ongoing organization that engages in interstate commerce by ordering and conducting inspections throughout the United States and assessing fees in association therewith on borrowers in each of the 50 states.   *See 2013 10-K*, p.9 ("We service mortgage loans in all 50 states, and we are licensed as a residential mortgage loan servicer/originator and debt collector in all states that require such licensing.").

91.     The members of the Enterprise function as a continuing unit and share the common purpose of maximizing their profits by charging Plaintiffs and the Classes for inflated and improper fees, including property inspection fees which are believed to include a kickback to

a member of the Enterprise.  Throughout the relevant time period, Nationstar has utilized its Servicing System to automatically order property inspections from vendors without regard to whether they were required under the standards of (a) loan contracts; (b) Lender guidelines; (c) reasonableness; or (d) law.  Importantly, Plaintiffs allege that it was the intentional failure to account for these standards, rather than the mere use of the Servicing System to order inspections, on which Plaintiffs' theory of liability is, in part, predicated.

92.     Additionally, since at least 2012, Nationstar has ordered these improper property inspections through its affiliate, Solutionstar.  The use of an unnecessary affiliated entity to boost the parent entities' profits is a further basis for Plaintiffs' claims.  Indeed, Defendants' indirect parent even recognizes this problem:  "By obtaining services from an affiliate, *there is additional risk due to possible claims of collusion or claims that such services are not provided at market cost.*"  *2013 10-K* at 25 (emphasis added).  Given Nationstar's previous questionable interactions with Auction.com, an affiliate through Fortress Investment Group – the indirect parent of Nationstar Mortgage Holdings Inc.'s majority owner, Nationstar has a demonstrated track record of such dealings.

93.     Here, Nationstar's use of an affiliated entity invokes both concerns.  Specifically, the price Nationstar charged borrowers for property inspections increased at the same time that Nationstar began funneling such requests through Solutionstar.  Furthermore, on information and belief, Nationstar also increased the frequency – up to three inspections in a 30-day period or more and sometimes multiple inspections in a single day – only after Solutionstar began providing these "services" as well.  It is clear that Nationstar began to collude with Solutionstar to drive up the fee income that Solutionstar received by increasing both the pricing and

frequency of property inspection orders.  Defendants used the Enterprise to effectuate this scheme.

94.     Written discovery will prove the Enterprise.  The Enterprise is linked through contractual relationships, agreements, access to the Nationstar Servicing System, financial ties, and coordination of activities between Defendants and the third-party property inspection vendors.  Nationstar's Servicing System is a common communication network by which Defendants and the Enterprise as a whole communicate and share information.  The Servicing System enables Defendants to charge Plaintiffs and the Class members for improper fees, to collect and record the payments of these fees, and to exchange the resulting profits.

95.     While Defendants participate in and are members of the Enterprise, they also have a separate and distinct existence apart from the Enterprise.

96.     Defendants control, operate and direct the affairs of the Enterprise by, among other things: (a) programming the Servicing System to automatically generate work orders for improper property inspections that instruct vendors to conduct the inspections; (b) dispatching vendors to inspect the property; (c) arranging for vendors to upload completed inspection reports to the Servicing System; (d) automatically assessing fees to borrowers for property inspections on monthly mortgage statements; and (e) collecting payments from borrowers that include inspection fees and then paying vendors while retaining portions of the payments for Defendants as a kickback.

## **Predicate Acts**

97.     Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud).  Florida RICO and FCRCP define "racketeering activity" and "criminal activity,"

respectively, to include "any conduct defined as 'racketeering activity' under 18 U.S.C. § 1961(1)."  As set forth below, Defendants have engaged, and continue to engage, in conduct violating each of these laws to effectuate their scheme.

### Violations of Mail and Wire Fraud Statutes

98.     For the purpose of executing and/or attempting to execute the above-described scheme to obtain money by means of false pretenses, representations, or promises, Defendants transmitted, by United States Postal Service, Federal Express and/or other mail delivery services, mortgage statements demanding payment for property inspections and other fees that were improperly assessed to borrowers as well as other related documents.  When Defendants caused these statements and payment demands to be transmitted, Defendants knew that the property inspections and corresponding fees were illegally inflated by the kickback retained, were too frequent, and were not authorized by the terms of the mortgage contracts, Lender guidelines or applicable law.

99.     These mortgage statements detail the amounts due on loans with certain itemized charges for fees.  By issuing mortgage statements to Plaintiffs and the Class, Nationstar represented to Plaintiffs and the Class that all amounts listed were lawful and appropriate fees and charges.  That representation was false and misleading.  Additionally, the mortgage statements containing these inappropriate and inflated property inspection fees were fraudulent in that they omitted Solutionstar's role and affiliation with Nationstar.  Thus, Defendants committed fraud by omission by failing to disclose that the fees did not reflect the cost of property inspections, but also included a kickback to Nationstar's affiliate.

100.    On or about June 18, 2014, Nationstar sent via United States Mail a Mortgage Loan Statement to the Shaikh Plaintiffs through their counsel, Loan Lawyers LLC.  *See* Exhibit

4.   That mortgage statement included *three* $15 charges for "Property Inspections" dated June 18, 2014, June 13, 2014 and May 27, 2014.   The Mortgage Loan Statement makes clear that these inspections were not new; rather Defendants assessed *$995* worth of property inspections during the year-to-date (slightly more than six months).   These "Property Inspections" were ordered electronically and automatically by Nationstar using the Servicing System, were ordered through Solutionstar, and were carried out by other members of the Enterprise.   The Mortgage Loan Statement fraudulently represents that these charges are lawful and proper.   The Mortgage Loan Statement does not disclose that the Shaikh Plaintiffs were assessed charges which included kickbacks retained by Solutionstar.   These inspections were unnecessary and unlawful as Nationstar had established a QRPC and knew that the property was not vacant.   Charging the Shaikh Plaintiffs for these inspections caused actual injury to their business and property.

101.   Similarly, on or about October 20, 2014 sent via United States Mail a Mortgage Loan Statement to the Hill Plaintiffs through their counsel, Loan Lawyers LLC.   *See* Exhibit 5. That mortgage statement included *three* $15 charges for "Property Inspections" (including two *on the same day*) dated September 30, 2014, September 30, 2014 and October 15, 2014.   The Mortgage Loan Statement makes clear that these inspections were not new; rather Defendants assessed more than *$278* worth of property inspections during the year-to-date.   These "Property Inspections" were ordered electronically and automatically by Nationstar using the Servicing System, were ordered through Solutionstar, and were carried out by other members of the Enterprise.   The Mortgage Loan Statement fraudulently represents that these charges are lawful and proper.   The Mortgage Loan Statement does not disclose that the Hill Plaintiffs were assessed charges which included kickbacks retained by Solutionstar.   These inspections were unnecessary and unlawful as Nationstar had established a QRPC and knew that the property was

not vacant.   Charging the Hill Plaintiffs for these inspections caused actual injury to their business and property.

102.   Defendants have also been sued by numerous borrowers in connection with property inspection charges assessed against them.   These suits detail additional predicate acts including, just for example:

    a.   *Sanchez v. Nationstar Mortgage, LLC*, No. 0:14-cv-62512 (S.D. Fla.).   Plaintiffs alleged that even though Nationstar established a QRPC and knew the property was inhabited, Nationstar ordered property inspections on September 26, 2014, September 30, 2014 and October 9, 2014 (three inspections in two weeks), at $15 per inspection; and

    b.   *Falconer v. Nationstar Mortgage, LLC*, No. 1:14-cv-24275 (S.D. Fla.).   Plaintiff alleged that even though Nationstar established a QRPC and knew the property was inhabited, Nationstar ordered property inspections to be performed on September 30, 2014 and October 17, 2014 (two inspections in 18 days), and charged the plaintiff for the inspections.

103.   Moreover, because this is a class action, and there were numerous acts of mail and wire fraud that were used to carry out the scheme, it would be impracticable for Plaintiffs to plead all details of the scheme with particularity.   Therefore, Plaintiffs cannot plead the precise dates of all of Defendants' violations of the mail and wire fraud statutes, as this information cannot be alleged without access to Defendants' records.   Discovery of Defendants' records and data will readily demonstrate this information.

104.   Defendants knew that they were generating substantial profit from their fraudulent scheme and that, if the true nature of their conduct were revealed, Plaintiffs and the Class members would not have paid these fees.   Indeed, had Plaintiffs and the Class members known the truth that these improper charges and inspection fees were a profit center for Defendants, rather than a mechanism to protect any interest in the property, they would not have paid the improper charges.   Furthermore, Defendants inappropriately induced and coerced members of

the Classes to enter into refinance agreements and loan modifications that caused these fees to be refinanced into the principal to the Classes' detriment and Defendants' profit.

105.    As a result of the scheme, Defendants have obtained Plaintiffs' and the Classes' money and damaged their property.  Moreover, based on charges such as these, Defendants have forced members of the Classes into foreclosure proceedings thereby jeopardizing the Class members' ability to stay in their homes.  Defendants' scheme could not succeed without the use of the mails and/or wires and the scheme's "success" is determined only by the volume of profits generated by Defendants – which were substantial.

**Pattern of Racketeering Activity**

106.    Defendants have engaged in a "pattern of racketeering activity" as defined by 18 U.S.C. § 1961(5) and Florida Statutes Sec. 895.02(4), and a "pattern of criminal activity" as defined by Florida Statute Sec. 772.102(1), by committing at least two acts of racketeering and criminal activity as described above within the last four years.  In fact, each of the Defendants committed thousands of such acts and continues to do so.  These acts constitute a pattern because they were related in that they have the same or similar intent, results, accomplices, and methods of commission.  These acts also caused harm to similar victims – *i.e.*, Plaintiffs and the Classes.

107.    Defendants' many racketeering and criminal acts were related to each other and amount to a continuing pattern of racketeering and criminal activity.

**RICO Violations**

108.    Section 1962(c) of RICO provides that it "shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce to conduct or participate directly or indirectly, in the conduct of such enterprises affairs through a pattern of racketeering activity…."  Defendants violated this

provision of RICO by operating the affairs of the Enterprise through the above-described pattern of racketeering. Plaintiffs were injured by Defendants' violations as described herein.

109.    Section 1962(d) of RICO further makes it unlawful to conspire to violate Section 1962(c). Defendants violated this provision by conspiring to operate the affairs of the Enterprise through the pattern of racketeering activity described herein.

110.    The same acts and practices that comprise Defendants' violations of the federal RICO Act form the basis for parallel causes of action under Florida RICO and the FCRCP.

## CLASS ACTION ALLEGATIONS

111.    Plaintiffs bring this action on their own behalf and on behalf of all persons similarly situated.

112.    Specifically, Plaintiffs seek certification of the following Class pursuant to FED. R. CIV. P. 23(b)(2) and 23(b)(3) in connection with their claims brought for Defendants' violation of the federal RICO Act:

> All persons in the United States with residential mortgage loans serviced by Nationstar who were charged computer-generated property inspection fees by Nationstar after they failed to make a timely payment of their mortgage (the "RICO Class").

113.    In addition, Plaintiffs seek certification of a Florida subclass pursuant to FED. R. CIV. P. 23(b)(2) and 23(b)(3) in connection with their claims brought for Defendants' violation of the Florida RICO Act and the FCRCP Act:

> All persons in the United States with residential mortgage loans secured by property in the State of Florida whose loans are or were serviced by Nationstar and who were charged computer-generated property inspection fees by Nationstar after they failed to make a timely payment of their mortgage (the "Florida RICO Subclass").

114.    Plaintiffs further seek certification of a Florida class pursuant to FED. R. CIV. P. 23(b)(2) and 23(b)(3) in connection with their common law claims against Defendants:

36

All persons in the State of Florida with residential mortgage loans serviced by Nationstar and who were charged computer-generated property inspection fees by Nationstar through Solutionstar (the "Florida Common Law Class").

115.    The RICO Class, the Florida RICO Subclass and the Florida Common Law Class are referred to herein as the "Classes."

116.    Excluded from the Classes are Defendants, any entity in which Defendants have a controlling interest or is a parent or subsidiary of Defendants, or any entity that is controlled by or controls a Defendant, along with such entities' officers, directors, employees, affiliates, legal representatives, heirs, predecessors, successors, and assigns.

117.    The persons in the Classes are so numerous that joinder is impracticable, and the disposition of their claims in this case and as part of a single class action lawsuit, rather than numerous individual lawsuits, will benefit the parties and greatly reduce the aggregate judicial resources that would be spent.

118.    Plaintiffs' claims are typical of the claims of the Classes they seek to represent. Plaintiffs are members of the Classes.

119.    The members of the Classes are ascertainable from Plaintiffs' description of each Class, using Defendants' records and/or records of third parties accessible through discovery.

120.    Plaintiffs will fairly and adequately represent the members of the Classes and have no interests that are antagonistic to the claims of the Classes.  Plaintiffs' interests in this action are antagonistic to the interests of Defendants, and they will vigorously pursue the claims of the Classes.

121.    Plaintiffs have retained counsel who are competent and experienced in class action litigation, and have successfully represented plaintiffs in complex class actions, including in actions against some of the largest loan servicers in the world, for mortgage servicing abuses.

122.   Common questions of law and fact impact the rights of each member of the Classes, and a common remedy by way of permissible damages, restitutionary disgorgement, and/or injunctive relief is sought for the Classes.

123.   There are numerous and substantial questions of law and fact common to all members of the Classes which predominate over any individual issues.  These common questions of law and fact include without limitation:

     a.   The nature, scope and operation of Defendants' wrongful policies;

     b.   Whether Defendants have engaged in mail fraud;

     c.   Whether Defendants have engaged in wire fraud;

     d.   Whether Defendants engaged in a pattern of racketeering and/or criminal activity;

     e.   Whether the Enterprise is an enterprise within the meaning of the Federal RICO Act;

     f.   Whether the Enterprise is an enterprise within the meaning of the Florida RICO Act;

     g.   Whether the Enterprise is an enterprise within the meaning of the FCRCP;

     h.   Whether Nationstar had a policy and practice of fraudulently charging persons in arrears unlawful and unreasonable inspection fees;

     i.   Whether Solutionstar received a kickback or other illicit benefit in connection with the fees charged to members of the Classes in connection with property inspections;

     j.   Whether Nationstar's property inspection fees breached the contract of the Florida Common Law Class;

k.      Whether Solutionstar was unjustly enriched at the expense of the Florida Common Law Class;

l.      Whether the members of the Classes are entitled to injunctive relief; and

m.      The proper measure of damages.

124.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.   Trial of Plaintiffs' and the Class members' claims is manageable.   Unless the Classes are certified, Defendants will be unjustly enriched at the expense of the members of the Classes.

125.    There is no plain, speedy or adequate remedy other than by maintenance of this class action because Plaintiffs are informed and believe that damage to each member of the Classes is relatively small, making it economically unfeasible to pursue remedies other than by way of a class action.

126.    Plaintiffs are unaware of any difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

127.    Defendants have acted on grounds generally applicable to the Classes, thereby making final injunctive relief or corresponding declaratory relief appropriate with respect to the class as a whole.   Prosecution of separate actions by individual members of the Classes would create the risk of inconsistent or varying adjudications with respect to individual members of the Classes that would establish incompatible standards of conduct for the Defendants.   Without a class action, Defendants will likely retain the benefit of their wrongdoing and will continue a course of action, which will result in further damages to Plaintiffs and the Classes.

## CAUSES OF ACTION

### COUNT I
### Violation of the Federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c)
### (Against All Defendants on Behalf of Plaintiffs and the RICO Class)

128.    Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

129.    Defendants are all "persons" within the meaning of 18 U.S.C. § 1961(3).

130.    Defendants operated, directed and controlled an ongoing associated-in-fact Enterprise comprised of Nationstar, Solutionstar, and various non-party property inspection vendors.

131.    The Enterprise had an identifiable structure and functioned as a continuing unit for a period of multiple years.  The Enterprise shared a common function of performing property inspections on delinquent borrowers.  Each entity in the Enterprise had its own distinct role: Nationstar monitored the loans for delinquency status, maintained the Servicing System, and operated the collections process from borrowers and Lenders.  Solutionstar served as the "middleman" between Nationstar and the property inspection vendors, setting the inflated price of the property inspection services and collecting the alleged kickback out of the inspection fee advances.  The property inspection vendors perform the drive-by inspections.

132.    The Enterprise's core operations were controlled by Defendants through Defendants' officers and employees using Nationstar's Servicing System.  In operating, directing and controlling the Enterprise, Defendants committed multiple acts of racketeering activity within the meaning of 18 U.S.C. § 1961, *et seq*.  These predicate acts included, but are not limited to mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1343.

133.     As a direct and proximate cause of these predicate acts, which Defendants committed during their operation, direction and control of the Enterprise, Plaintiffs and RICO Class members were injured in their property.  In particular, and without limitation:

a.      Defendants' conduct inflated the amounts that Plaintiffs and the RICO Class owe on their mortgage by more than they would owe if Defendants behaved lawfully;

b.      Defendants' conduct caused Plaintiffs and the RICO Class to pay for excessive and unlawful property inspections;

c.      Defendants' conduct caused Plaintiffs and members of the RICO Class to incur other fees and charges that they would not have incurred otherwise, such as late fees;

d.      By stratifying Plaintiffs' and the RICO Class members' delinquent status through Defendants' conduct, Defendants have placed a cloud on Plaintiffs' and the RICO Class members' credit-worthiness, restricting or eliminating Plaintiffs' and the RICO Class members' ability to obtain personal and/or business credit;

e.      Defendants' conduct further inhibits Plaintiffs' and the RICO Class members' ability to transfer or modify or refinance their mortgage; and

f.      Due to Defendants' conduct, Plaintiffs and the RICO Class members will be forced to incur legal expenses for costs and attorneys' fees in order to avoid foreclosure and to remedy Defendants' wrongs.

134.     Plaintiff and the RICO Class are entitled to reimbursement of all amounts taken from them and/or their escrow accounts to pay for these excessive, unnecessary and unlawful property inspection fees and associated and related damages.

135.     Plaintiffs and the RICO Class are further entitled to remedial notice to be provided to credit reporting bureaus and/or to be filed in foreclosure proceedings.

136.     Plaintiffs and the RICO Class are also entitled to other remedies as deemed appropriate by the Court.

<u>COUNT II</u>
**Violation of the Federal RICO Act, 18 U.S.C. §1962(d)**
**(Against All Defendants on Behalf of Plaintiffs and the RICO Class)**

137.    Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

138.    Defendants conspired to use the Enterprise to defraud Plaintiffs and the RICO Class through the illegal scheme described herein.  This conspiracy violates 18 U.S.C. § 1962(d). Specifically, Nationstar conspired with Solutionstar to use the Enterprise via the Servicing System to order property inspections that were excessive and unlawful in number, frequency and cost.  Defendants conspired to utilize this illegal scheme to enrich themselves at Plaintiffs' and the RICO Class members' expense.

139.    Nationstar and Solutionstar intentionally conspired and agreed to conduct and participate in the conduct of the affairs of the Enterprise through a pattern of racketeering activity.  Defendants knew their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the scheme.  That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d).

140.    Defendants are therefore liable to Plaintiffs and the RICO Class under the federal RICO Act.

<u>COUNT III</u>
**Violation of the Florida Racketeer Influenced and Corrupt Organizations Act ("Florida RICO"), Florida Statutes Sec. 895.03(3)**
**(Against All Defendants on Behalf of Plaintiffs and the Florida RICO Subclass)**

141.    Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

142.    Florida Statute 895.03(3) provides that "[i]t is unlawful for any person employed by, or associated with, any enterprise to conduct or participate directly or indirectly in such enterprise through a pattern of racketeering activity…."

143.    Defendants are all "persons" within the meaning of Florida Statute 895.03(3).

42

144.    Plaintiffs and the Florida RICO Class are "aggrieved person[s]" under Florida Statute 895.05.

145.    Defendants operated, directed and controlled an ongoing associated-in-fact Enterprise comprised of Nationstar, Solutionstar, and various non-party property inspection vendors.

146.    The Enterprise had an identifiable structure and functioned as a continuing unit for a period of multiple years.  The Enterprise shared a common function of performing property inspections on delinquent borrowers.  Each entity in the Enterprise had its own distinct role: Nationstar monitored the loans for delinquency status, maintained the Servicing System, and operated the collections process from borrowers and Lenders.  Solutionstar served as the "middleman" between Nationstar and the property inspection vendors, setting the inflated price of the property inspection services and collecting the alleged kickback out of the inspection fee advances.  The property inspection vendors perform the drive-by inspections.

147.    The Enterprise's core operations were controlled by Defendants through Defendants' officers and employees using Nationstar's Servicing System.  In operating, directing and controlling the Enterprise, Defendants committed multiple acts of racketeering activity within the meaning of Florida Statute 895.01, *et seq.*  These predicate acts included, but are not limited to mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1343, which are incorporated into the list of "racketeering activit[ies]" in Florida Statute 895.02(1)(b).

148.    As a direct and proximate cause of these predicate acts, which Defendants committed during their operation, direction and control of the Enterprise, Plaintiffs and Florida RICO Subclass members were injured in their property.  In particular, and without limitation:

a.   Defendants' conduct inflated the amounts that Plaintiffs and the Florida RICO Subclass owe on their mortgages by more than they would owe if Defendants behaved lawfully;

b.   Defendants' conduct caused Plaintiffs and the Florida RICO Subclass to pay for excessive and unlawful property inspections;

c.   Defendants' conduct caused Plaintiffs and members of the Florida RICO Subclass to incur other fees and charges that they would not have incurred otherwise;

d.   By stratifying Plaintiffs' and the Florida RICO Subclass members' delinquent status through Defendants' conduct, Defendants have placed a cloud on Plaintiffs' and the Florida RICO Subclass members' credit-worthiness, restricting or eliminating Plaintiffs' and the Florida RICO Subclass members' ability to obtain personal and/or business credit;

e.   Defendants' conduct further inhibits Plaintiffs' and the Florida RICO Subclass members' ability to transfer or modify or refinance their mortgage;

f.   Due to Defendants' conduct, Plaintiffs and the Florida RICO Subclass members will be forced to incur legal expenses for costs and attorneys' fees in order to avoid foreclosure and to remedy Defendants' wrongs.

149.   Plaintiffs and the Florida RICO Subclass are entitled an order enjoining further violation of the Florida RICO statute, among other injunctive relief the Court may find reasonable and appropriate.

150.   Plaintiffs and the Florida RICO Subclass are also entitled to other remedies as deemed appropriate by the Court.

### COUNT IV
**Violation of the Florida RICO Act, Florida Statutes Sec. 895.03(4)**
**(Against All Defendants on Behalf of Plaintiffs and the Florida RICO Subclass)**

151.   Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

152.   Defendants conspired to use the Enterprise to defraud Plaintiffs and the Florida RICO Subclass through the illegal scheme described herein.  This conspiracy violates Florida Statute 895.03(4).  Specifically, Nationstar conspired with Solutionstar to use the Enterprise via

the Servicing System to order property inspections that were excessive and unlawful in number, frequency and cost.  Defendants conspired to utilize this illegal scheme to enrich themselves at Plaintiffs' and the Florida RICO Subclass members' expense.

153.    Nationstar and Solutionstar intentionally conspired and agreed to conduct and participate in the conduct of the affairs of the Enterprise through a pattern of racketeering activity.  Defendants knew their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the scheme.   That conduct constitutes a conspiracy to violate Florida Statute 895.03(3) in violation of Florida Statute 895.03(4).

154.    Defendants are therefore liable to Plaintiffs and the Florida RICO Subclass under the Florida RICO Act.

### COUNT V
**Violation of the Florida Civil Remedies for Criminal Practices Act (the "FCRCP" Act), Florida Statutes Sec. 772.103(3)**
**(Against All Defendants on Behalf of Plaintiffs and the Florida RICO Subclass)**

155.    Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

156.    Florida Statute 772.103(3) provides that "[i]t is unlawful for any person … [e]mployed by, or associated with, any enterprise to conduct or participate directly or indirectly in such enterprise through a pattern of criminal activity …."

157.    Defendants are "persons" under Florida Statutes Section 772.103.

158.    Defendants operated, directed and controlled an ongoing associated-in-fact Enterprise comprised of Nationstar, Solutionstar, and various non-party property inspection vendors.

159.    The Enterprise had an identifiable structure and functioned as a continuing unit for a period of multiple years.  The Enterprise shared a common function of performing property inspections on delinquent borrowers.  Each entity in the Enterprise had its own distinct role:

Nationstar monitored the loans for delinquency status, maintained the Servicing System, and operated the collections process from borrowers and Lenders.  Solutionstar served as the "middleman" between Nationstar and the property inspection vendors, setting the inflated price of the property inspection services and collecting the alleged kickback out of the inspection fee advances.  The property inspection vendors perform the drive-by inspections.

160.    The Enterprise's core operations were controlled by Defendants through Defendants' officers and employees using Nationstar's Servicing System.  In operating, directing and controlling the Enterprise, Defendants committed multiple acts of criminal activity within the meaning of Florida Statute 772.101, *et seq.*  These predicate acts included, but are not limited to mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1343, which are incorporated into the list of "criminal activit[ies]" in Florida Statute 772.102(1)(b).  Thus, Defendants violated Florida Statute Sec. 772.103(3).

161.    As a direct and proximate cause of these criminal acts, which Defendants committed during their operation, direction and control of the Enterprise, Plaintiffs and Florida RICO Subclass members were injured.  In particular, and without limitation:

      a.    Defendants' conduct inflated the amounts that Plaintiffs and the Florida RICO Subclass owe on their mortgage by more than they would owe if Defendants behaved lawfully;

      b.    Defendants' conduct caused Plaintiffs and the Florida RICO Subclass to pay for excessive and unlawful property inspections;

      c.    Defendants' conduct caused Plaintiffs and members of the Florida RICO Subclass to incur other fees and charges that they would not have incurred otherwise;

      d.    By stratifying Plaintiffs' and the Florida RICO Subclass members' delinquent status through Defendants' conduct, Defendants have placed a cloud on Plaintiffs' and the Florida RICO Subclass members' credit-worthiness, restricting or eliminating Plaintiffs' and the Florida RICO Subclass members' ability to obtain personal and/or business credit;

      e.      Defendants' conduct further inhibits Plaintiffs' and the Florida RICO Subclass members' ability to transfer or modify or refinance their mortgage;

      f.      Due to Defendants' conduct, Plaintiffs and the Florida RICO Subclass members will be forced to incur legal expenses for costs and attorneys' fees in order to avoid foreclosure and to remedy Defendants' wrongs.

162.    Plaintiffs and the Florida RICO Subclass are entitled threefold their actual damages sustained, but not less than $200 each as well as reasonable attorneys' fees and costs.

163.    Plaintiffs and the Florida RICO Subclass are also entitled to other remedies as deemed appropriate by the Court.

<u>COUNT VI</u>
**Breach of Contract**
**(Including Breach of Implied Covenant of Good Faith and Fair Dealing)**
**(Against Nationstar on Behalf of Plaintiffs and the Florida Common Law Class)**

164.    Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

165.    Plaintiffs' mortgage loans are owned and/or guaranteed by Fannie Mae.

166.    On information and belief, the Hill Plaintiffs' mortgage contract uses the standard Fannie Mae/Freddie Mac Uniform Security Instrument with language substantially similar to the language identified herein.  The Shaikh Plaintiffs' mortgage contract uses the same form.

167.    Pursuant to Plaintiffs' mortgage contracts, in the event the Loan Servicer or Lender acted to protect the property, the Loan Servicer and/or Lender were obligated to do so only in a manner that was "reasonable and appropriate."

168.    Plaintiffs' mortgage loans are serviced by Defendant Nationstar.

169.    As the Loan Servicer, Nationstar acquired and/or retains certain contractual rights and obligations including compliance with the terms of Paragraphs 7 and 9.

170.    Nationstar, as described herein, ordered numerous drive-by property inspections at a rate in excess of once every 30 days – and, in some cases, in excess of once in a single day. Nationstar assessed charges to Plaintiffs for each of these inspections.

171.    The frequency of these inspections was excessive and neither reasonable nor appropriate.  Further exacerbating the unreasonableness of the inspections, Nationstar knew that Plaintiffs inhabited their homes which secured the mortgages because Plaintiffs informed Nationstar of that fact.  Thus, Plaintiffs were not obligated to pay for these inspections that were too frequent and were otherwise unnecessary.

172.    Nevertheless, Nationstar charged Plaintiffs for these excessively frequent and unnecessary property inspections.

173.    Nationstar breached Plaintiffs' mortgages by charging Plaintiffs for property inspections that Plaintiffs were not required to pay for by the terms of their mortgages.

174.    In addition, on information and belief, the charges Plaintiffs incurred in connection with these excessive property inspections were inflated by Solutionstar's role in the transaction.  Nationstar's affiliation and scheme with Solutionstar are an additional ground for the unreasonableness and inappropriateness of Nationstar's ordering of property inspections.

175.    Nationstar breached Plaintiffs' mortgages by charging Plaintiffs for property inspections that were overly expensive due to the portion of the charge that was retained by Nationstar and/or its affiliate Solutionstar.

176.    Plaintiffs are not alone in suffering from Nationstar's conduct in breach of underlying mortgage agreements.  Nationstar similarly breached the mortgage contracts of other members of the Florida Common Law Class by requiring them to pay for property inspections

that were unnecessary, excessively frequent and for which Nationstar and/or its affiliate Solutionstar received compensation.

177.     Moreover, every contract contains an implied covenant of good faith and fair dealing.

178.     In all of their actions described herein, Nationstar acted on its own behalf.

179.     The mortgage contracts of Plaintiffs and the Florida Common Law Class contained an implied covenant of good faith and fair dealing, pursuant to which Nationstar was bound to exercise the discretion afforded them under the mortgage contract in good faith and to deal fairly with Plaintiffs and the Florida Common Law Class in that regard.  Nationstar was not allowed to evade the spirit of the mortgage contract by exercising discretion afforded them under the mortgage to order property inspections and charge borrowers in an abusive manner.

180.     Any discretionary authority granted to Nationstar under the terms of the mortgage contracts was subject to Nationstar's implied duty of good faith and fair dealing.  Accordingly, to the extent that the mortgage contracts of Plaintiffs and the members of the Florida Common Law Class permitted Nationstar to order property inspections and charge the cost of those inspections to the borrowers, Nationstar was obligated not to exercise that discretion in bad faith for their own financial gain at borrowers' expense.

181.     Nationstar breached its duty of good faith and fair dealing in at least the following respects, among others:

        a. ordering property inspections more frequently than requested or required by the Lender in order to perpetuate Plaintiffs' and members of the Florida Common Law Class's delinquency;

b. ordering property inspections through an affiliate that retained a portion of the property inspection charge as profit;

c. imposing charges for property inspections on Plaintiffs and/or members of the Florida Common Law Class that are not permitted by applicable law or regulation; and

d. imposing charges for property inspections on Plaintiffs and/or members of the Florida Common Law Class that are not permitted or requested by the Lender.

182.    By ordering property inspections that goes well beyond the pale of what is required to protect the Lender and by doing so in a manner to maximize their profits and/or the profits of their affiliate, Solutionstar, Nationstar has breached the implied covenant of good faith and fair dealing.

183.    As the direct, proximate and legal result of these breaches of the express terms of the contract and the implied covenant of good faith and fair dealing, Plaintiffs and members of the Florida Common Law Class have suffered damages and are entitled to the relief sought herein for such breaches.

## <u>COUNT VII</u>
**Unjust Enrichment**
**(Against Solutionstar on Behalf of Plaintiffs and the Florida Common Law Class)**

184.    Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

185.    Plaintiffs and the Florida Common Law Class have conferred a substantial benefit upon Solutionstar derived from the property inspection fees that Plaintiffs and the Florida Common Law Class paid and/or were charged and had debited from their escrow accounts.

186.    These payments and debits were accepted and retained by Solutionstar under circumstances such that it would be inequitable for Solutionstar to retain the benefit without

payment to Plaintiffs and the Florida Common Law Class insofar as, among other things, Defendants overcharged a set of captive buyers (Plaintiffs and the Florida Common Law Class) for property inspections that were not permitted or called for by Plaintiffs' or the Florida Common Law Class members' mortgages, Lenders or applicable laws or regulations.

187.   Solutionstar retained a portion of the fees assessed on Plaintiffs and the Florida Common Law Class as a kickback even though Solutionstar did not provide a service that warranted the payments.

188.   As a result of Solutionstar's unjust enrichment, Plaintiffs and the Florida Common Law Class members have sustained damages in an amount to be determined at trial and seek full disgorgement and restitution of Defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful and wrongful conduct alleged herein.

189.   Plaintiffs and the Florida Common Law Class also seek restitution and disgorgement of profits realized by Solutionstar as a result of their unfair, unlawful and/or deceptive practices.

190.   Solutionstar received from Plaintiffs and the Florida Common Law Class a benefit in the form of overcharges for property inspection fees that were excessive and unreasonable in price, frequency, and whether they should have been ordered at all.  The retained portion of these inspection fees is the result of overreaching and self-dealing.

191.   Solutionstar entered into an agreement with Nationstar whereby Solutionstar would serve as the middleman between Nationstar and property inspection vendors and Solutionstar would be paid a portion of the property inspection fees that Nationstar assessed on borrowers.  Solutionstar's position was superfluous and unnecessary in these transactions and performed no services that would warrant the income retained.  Plaintiffs and the Florida

Common Law Class were assessed fees that were far higher than the market rate for the inspections which accounted for the ill-gotten income Solutionstar received.

192.   As a result, Plaintiffs and the Classes have conferred a benefit on Solutionstar and Solutionstar has knowledge of and voluntarily accepted and retained that benefit.

193.   Solutionstar will be unjustly enriched if they are allowed to retain the benefit and Plaintiffs and the Florida Common Law Class is entitled to an amount equal to the amount they enriched Solutionstar and for which Solutionstar has been unjustly enriched.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves, the RICO Class, the Florida RICO Subclass and the Florida Common Law Class, pray for judgment entering the following relief:

a)   An order certifying a nationwide class for Counts I and II (federal RICO violations), and certifying the Florida RICO Subclass and Florida Common Law Class for Counts III-VII (Florida RICO & FCRCPA violations and common law causes of action) under FED. R. CIV. P. 23;

b)   Injunctive relief requiring Defendants to cease the unlawful practices;

c)   An award of actual damages, treble damages, and attorneys' fees and costs pursuant to the federal RICO statute, the Florida RICO statute and the FCRCPA;

d)   An award of statutory damages under the FCRCPA;

e)   Damages attributable to Defendants common law violations as alleged herein as allowed by law;

f)   An award of prejudgment and post-judgment interest to Plaintiffs and the Classes;

g)   An award of attorneys' fees and costs as provided by law;

h)      An order requiring Defendants to send corrective notice to each of the credit reporting agencies and bureaus concerning the unlawful fees and charges described herein; and

i)      Any other relief as this Court may deem proper and just.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands a trial by jury as to all claims so triable.

Dated:  January 20, 2015

/s/ Yechezkel Rodal
Yechezkel Rodal
LOAN LAWYERS LLC
2150 S. Andrews Avenue, 2nd Floor
Ft. Lauderdale, FL 33316
Tel: (954) 523-4357
Chezky@Floridaloanlawyers.com

Shanon J. Carson
Patrick F. Madden
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Telephone: (215) 875-4656
Facsimile: (215) 875-4604

*Attorneys for Plaintiffs*